**NUSPEL v. CLARK, Atty. Gen., et al.**

**No. 7577.**

United States District Court
E. D. Michigan, S. D.

May 17, 1949.

Donald B. Frederick, Detroit, Mich., for plaintiff.

Edward T. Kane, United States Attorney, and Kenneth W. Smith, Asst. U. S. Attorney, Detroit, Mich., for defendants.

LEDERLE, Chief Judge.

## Findings of Fact

1. This is an action brought under Section 503 of the Nationality Act of 1940, 8 U.S.C.A. § 903, in which plaintiff seeks a judgment declaring him to be a national of the United States, claiming that the two defendants have denied him rights and privileges to which he is entitled as a naturalized citizen.

2. Plaintiff, now 55 years of age, made lawful entry into the United States for permanent residence from his native country, Hungary, on September 13, 1913. Shortly after arriving in this country, he took up his permanent residence in Detroit, Michigan, and has claimed Detroit as his permanent home since that date. He was married in the City of Detroit in 1916, and in 1923 purchased a home in which he resided until October, 1931, when he was no longer able to keep up the monthly payments. He was steadily employed up to 1929 when he suffered an industrial accident, resulting in the loss of his right eye. He received compensation for this injury and was advised by the doctor not to do any other work for the reason that such activity might result in the loss of his other eye.

3. As a youth while living in Hungary, the only language that he was familiar with was German. He studied German in school, and German was the language that was commonly used in the small village of Gara where he was born and lived up to the time that he came to the United States. While employed in Detroit, he attended public night schools, learned the English language, and studied to become a citizen of the United States. He became a citizen by naturalization in this Court on June 13, 1927, and was given a Certificate of Naturalization number 2574872. This certificate of naturalization has never been revoked, and no action is pending at this time for its revocation. In 1920, the plaintiff's parents and younger brother made lawful entry into the United States for permanent residence. They came to Detroit and temporarily resided with the plaintiff, and then procured their own home. In 1931, the father became ill and decided to return to his native land. He purchased a small farm of approximately three acres in his native village and continued to reside there until his death in January, 1945.

4. Plaintiff's wife died in 1930, leaving him with one child, a son Joseph, then 13 years of age. His father's health did not improve, and he was advised that if he desired to see his father alive he should come to Hungary at once. He secured an American passport and with his son returned to Gara, Hungary in November, 1931. Upon his arrival he found his father bedridden and unable to perform any work. His mother expressed the desire to return to the United States and requested him to remain with her and assist in taking care of the father. It seemed apparent at that time that the father could not live very long, and for a time plaintiff lived with his parents. In 1932, he married a resident of Gara whom he had known as a youth. Thereupon he purchased a small house and a farm of approximately six acres directly across the street from his parents' home. He was unable to work the land, but secured some income by leasing it on a sharecrop basis.

5. Immediately after arriving in Gara in 1931, plaintiff reported to the mayor's office in order to register, as was required of all non-citizens of Hungary. Being unable to read, write, speak, or understand the Hungarian language, he carried on all of his conversations while in Hungary in the German tongue. After three months he was notified to appear at the mayor's office again for the purpose of re-registering, and there procured a card which he referred to as a card for "living rights." This cost him approximately $25 in American money and was valid for only three months. Each renewal would require a similar expenditure. Late in 1934, he learned that if he could meet the requisite qualifications, upon the payment of $93 he could secure a permit that was good indefinitely. He again reported to the mayor's office, and at that time an application was made out in the Hungarian language by an employe of the mayor's office, upon instructions from the mayor, which plaintiff signed. In January 1935, he was again requested to report to the mayor's office, and at this time received the permanent permit. He did not make an application

for repatriation as a citizen of Hungary, and he did not take an oath of allegiance to the government of Hungary.

6. In 1935, plaintiff's son decided to return to America. Since the names of father and son were both on the same passport, they visited the American consulate in Budapest to have a separate passport issued for the son. At that time the American consul informed the plaintiff that he could return to the United States whenever he desired, provided he would have his passport renewed every two years. Budapest is approximately 200 miles from Gara, and in 1937 he returned to the American consul in Budapest and had his passport renewed. Two years later in 1939, when the time came to renew the passport, World War II had broken out, and he was informed that the American consulate in Budapest had been closed. Further he would have been unable to secure transportation for the reason that all available transportation facilities were being used by the army.

7. Plaintiff's son corresponded with him continuously, including the term of service that he spent in the United States Navy, and it was the understanding between father and son at all times that the father would return to the United States as soon as it was possible. In January 1946, plaintiff learned that the American consulate had re-opened in Budapest, and upon a visit there was informed that in order to retain his American citizenship, it would be necessary for him to return to the United States prior to October 13, 1946. He immediately sent a cable to his son and brother in Detroit for funds, and then returned to his home in Gara. Shortly thereafter he received a message from the American consulate at Budapest that it would be necessary that he return to the United States on or before October 1, 1946. He immediately returned to the American consulate in Budapest and informed the consul that he had not yet received sufficient funds to pay for his transportation. The consul agreed to advance such funds, which have since been repaid by the plaintiff. A United States passport was issued on September 16, 1946. He arrived in the United States on September 30, 1946.

8. On December 30, 1946, the plaintiff filed a petition for the issuance of immigration visa on behalf of his wife and stepdaughter under Section 9 of the Immigration Act of 1924, 8 U.S.C.A. § 209. At the time he received his passport to return to the United States, he surrendered his certificate of naturalization to the American consul. He was informed that it would be returned to him at his residence address in Detroit. Up to date this naturalization certificate has not been returned to him. It is conceded by the plaintiff that he is not entitled to an immigration visa for his stepdaughter.

9. Findings Number 2 to 8 inclusive are based upon the testimony of the plaintiff, corroborated in part by the testimony of his son and some documentary evidence. As a witness, the plaintiff was frank and honest. He has been a law abiding citizen. He conducted himself as a faithful and loving son, husband, and father. The sacrifices he made to prepare himself for citizenship and his exemplary conduct here and abroad stamps him as a person worthy of belief. He was thoroughly cross-examined and answered all questions promptly, without any attempt to evade a complete disclosure of all his activities.

10. The only evidence offered by the defendants consisted of certain documents. The allegations in these documents "were questionable from a procedural and substantive standpoint." See Klapproot v. United States, 335 U.S. 601–610, 69 S.Ct. 384. They are based in part upon hearsay statements made by an alleged officer of a foreign government. If it is conceded that such evidence is admissible in a proceeding of this kind, it falls far short of the "clear, unequivocal, and convincing evidence required to deprive an American citizen of the rights and privileges to which he is entitled as such." See Schneiderman v. United States, 320 U.S. 118–125, 63 S.Ct. 1333, 1336, 87 L.Ed. 1796.

11. The Secretary of State declined to issue the visa for the plaintiff's wife on the ground that he is not a citizen of the United States and has held the matter in abeyance pending the ultimate determination of his status. Counsel for the defend-

ants assert that this "holding in abeyance" does not constitute a denial of such rights or privileges. It seems, however, that the failure to grant the visa for plaintiff's wife within a reasonable time constitutes a denial of such application equally as much as justice delayed is justice denied.

12. Following his communication to the Secretary of State, plaintiff received a letter from the United States Department of Justice, Bureau of Immigration. In response to this letter, he appeared at the Detroit office August 2, 1947. At that time he was served with a warrant charging him with illegal entry into the United States, and notified that hearings would be conducted thereunder. He was required to be fingerprinted and to register as an alien. Thereafter, hearings were had before an inspector of the United States Department of Justice, Bureau of Immigration and Naturalization, with the object in view of deporting him because of his alleged illegal entry.

13. Plaintiff has established by competent evidence that he has at all times since June 13, 1927, been a national of the United States of America and is entitled to all the rights and privileges of such a national. He has been denied such rights and privileges on the ground that he is not a national.

### Conclusions of Law

1. This is an action brought under Section 503 of the Nationality Act of 1940, 8 U.S.C.A. § 903, and this Court has jurisdiction.

2. The unreasonable delay in granting the application for an immigration visa for the wife of the plaintiff constitutes a denial of a right or privilege of a national upon the ground that he is not a national.

3. The acts of the agents of the Bureau of Immigration and Naturalization in causing the arrest of the plaintiff and requiring him to register as an alien and requiring him to appear at deportation hearings constitute a denial of the rights and privileges of a national upon the ground that he is not a national.

4. It therefore follows that the plaintiff is entitled to a judgment declaring him to be a national of the United States of America, and as such, entitled to all the rights and privileges thereof.

### Judgment

In accordance with the foregoing findings of fact and conclusions of law,

It is hereby adjudged and declared that the said plaintiff, Stefan Nuspel, is now and has been at all times since June 13, 1927, a national of the United States of America, and as such is entitled to all the rights and privileges thereof.